The Surrogate.
The only questions submitted for consideration are as to whether the executor is liable for the loss of the two thousand dollars of Mrs. Baylies’ share, invested in government bonds and lost; whether he shall be allowed, as a credit, the sum of two thousand five hundred dollars for the professional services of Mr. Barker; whether he shall be allowed the item of two hundred and fifty dollars for money paid for clerical services, and whether this court has jurisdiction so far as relates to the Mrs, Rea trust.
The counsel for the executor insiste that the latter is not liable to make good to the estate the loss occasioned by the disappearance of the two thousand dollars invested in the bonds, 1. Because it was the devastavit of his co-executor; and 2. Because the beneficiary for life concurred in the making of the investment, in that manner, by the attorney of the executors, and is, therefore, estopped from claiming its restoration to the fund by the surviving executor. These, at least, I understand to be the grounds he takes.
It is undoubtedly a sound legal rule that one executor or trustee is not responsible for the wrongful act of his co-executor or trustee where he does not assent, or contribute, thereto, or concur therein. Sutherland v. Brush (7 Johns. Ch., 17), and the converse of the proposition is equally well settled. But, I apprehend^ this case does not present the question as to whether one executor is liable, under a given state of facts, for the devastavit of his co-executor.
Mr. Barker appears to have been the trusted counsel of the deceased and of his executors. He was regarded by them,—by some, if not all, of the beneficiaries,— and, perhaps, by all who knew him, as a man of integrity, and skilled in affairs. His career presents no new phase of life or character. A genial, kindly, care *464 less, improvident man, trusted by everyone, and unworthy of such trust. The executors, therefore, very naturally entrusted him with the management of this large estate. I look in vain for evidence of any facts tending to show that one of the executors more than the other contributed to the placing of the funds in his hands and under Ms management. The proceeds of the judgment against Sidney S. Blackwell and the ■twenty thousand dollars cash, as part proceeds of sale ■of 196 Broadway, and the seventy thousand dollar mortgage, seem to have all passed at once into his hands. There is no more evidence that the deceased executor received any of the money, than there is that the surviving executor did. It was taken by Mr. Barker by their mutual consent. In fact, S. S. Blackwell’s share, over which he had no control as executor, must have passed into Barker’s hands by the assent only of .Mr, Brown, as he was sole executor and trustee as to that share. They were both present when the Blackwell judgme'nt was paid, and executed a satisfaction piece for the same. Again they were both present at the sale of the Broadway property, and executed a ■conveyance thereof when the twenty thousand dollars ■was paid, and the seventy thousand dollar mortgage was given. It is probable that Mr. Brown deferred somewhat in the conduct of the affairs of the estate to his co-executor, who was a brother of the deceased. But Mr. Brown had been a business partner of the deceased, and he knew that the testator especially desired that he should aid in managing the estate; and he also must have known the further fact, which I gather from the evidence before me, that Sidney S. Blackwell was somewhat improvident in the management of his own .affairs. It was therefore plainly his duty to interpose, when he had reason to apprehend loss to the estate, .and prevent it, if possible. But no one, at the time of .Sidney’s death, seems to have suspected there was *465 ■danger of any such loss. The executors equally contributed to the placing of the funds in the hands of Mr. Barker, as I have endeavored to show, and it appears to me clear that Mr. Brown is just as much liable for the two thousand dollar devastavit as if he himself had invested the amount improperly and lost it. The maxim “ quifacitper alivrn, per seipsumfacere videturf I can but regard as applicable here. Shortly after the purchase of the bonds, in violation of the directions in the will, Mr. Brown knew of the investment. There is no evidence that he made any objection, and Ms assent must be presumed. Indeed, for six years after the fact came to his knowledge, he acquiesced in the mode of investment) and made no effort to restore the money to the purposes of the trust (Styles v. Guy, 1 Macn. & Gord., 422).
That Mrs. Baylies assented and received the interest directly from Mr. Barker, through her husband or Miss Harriet S. Baylies, her daughter, can make no difference, in so far as the loss is concerned. There is no foundation for an estoppel in pais. She was not sui juris (Penman v. Slocum, 41 N. Y., 53).
The loss to the fund did not occur because of the investment in a mode not authorized by the will, but as a result of the insolvency of the agent. Mrs. Bay-lies, is only interested in the fund during her life, and neither her consent nor the consent of her children, as to the mode of investment, and the person by xvhom it was invested, can, in any event, affect those entitled to the fund at her death. Mrs. Baylies probably knexv very little about the affairs of the estate and their management. She was not familiar xvith business matters, and relied, doubtless, upon those upon whom the law devolved the responsibility in that regard, and the law is invoked for the protection of her rights, and it should not fail her.
Some stress is laid upon the fact, by the counsel for *466 the executor, that Mr. Brown, after the death of his-co-executor, repeatedly called on Mr. Barker to render to him a statement of the condition of the estate, and that Mr. Barker put him off and evaded his requests, as evidence to show that the executor strove to do his duty. Ordinarily, this conduct of the agent would tend to excite suspicion, and wás a just ground for the exercise of vigilance on the part of the executor. If the conduct of Mr. Barker, in this respect, caused a passing apprehension of something wrong, it was doubtless allayed by the reflection that he was a man of high character. But, after all, I can not see, in the view I take of the case, that this point is entitled to any weight. Mr. Barker, after the death of the co-executor, became the agent of the surviving one, and he must be held responsible for his acts. It results from the very nature of the office of a trustee that it can not.be delegated to others, being of a strictly personal and fiduciary character (Turner v. Corney, 5 Beav., 517). So that the trustee is himself responsible for the faithful conduct and competency of all his subordinates and assistants, whether strangers, attorneys, or contractors (Lewin, 2045; Chambers v. Minchin, 7 Vesey, 196; Langford v. Gascoyne, 11 Id., 333; Robertson v. Armstrong, 28 Beav., 123). Mr. Brown recognizes his liability for the other loss of six thousand dollars. I fail to discover any distinction as to the manner in which that sum and the two thousand dollars were lost that can in any way enure to the-benefit of the executor.
Counsel for the executor has submitted a very able-brief, and has, among other things, called attention to the case of Banks v. Wilkes (3 Barb. Ch. R., 99). The facts in that case are substantially as follows: Charles Wilkes was banker for James Campbell, who died leaving funds in the banker’s hands. By Ms will he made Ms sister, Miss Campbell, sole legatee and ex *467 ecutrix. Wilkes then acted as her banker, and invested of the funds which the testator had in his hands at Ms death, fifteen thousand dollars on bond and mortgage for Miss Campbell. Wilkes died leaving a will in wMch he appointed an executrix and executors, oi whom Horatio Wilkes was one, and the bond and mortgage came into his hands among the other assets of Ms testator. He rendered accounts to Miss Campbell headed “with estate of Charles Wilkes,” and he repeatedly gave his written acknowledgment that he held them for her. She received the income from Mm. He afterwards received and lost six thousand dollars of the fund, and died insolvent.
All the executors assented that Horatio should take and manage the estate of his farther, and Miss Campbell’s fund thus came into his hands. The assistant Y. C. says; “I do not discover any breach of trust in this circumstance. There is no proof that the defendants agreed to intrust the control and management of Miss OJs securities to HoraMo. They were simply passive, suffering them to pass into his custody.” I do not perceive any analogy between that case and the one under consideration. Here the agent is not one of the executors, as was the fact there, nor was the executor “simply passive” in the disposition of the funds, any more than was his co-executor. Both concurred in the mode in which the estate was managed. As the surviving executor was sole executor of Mr. S. S. Blackwell’s share of the estate, and as that share went into Mr. Barker’s hands, the conclusion is irresistible that it went there with the full knowledge and assent of Mr. Brown. At aH events, there can be no reasonable doubt that all of the funds of the estate were received by Mr. Barker with his full knowledge and assent, and it is certain that they remained there for six years after he became sole executor, with Ms like full knowledge and assent. If he did not origin *468 ally take any active part in placing the funds in Barker’s hands, he permitted him to receive, in 1868, two years after the death of his co-executor, the large balance of about fifty-six thousand dollars due on the seventy thousand dollar mortgage, and to manage and control the funds of the estate as his agent. I do not think the fact testified to by the executor, that all the parties wished Mr. Barker to manage the estate, entitled to much consideration. The language of the witness was very general, but even if he could have specified every one of those interested, it could scarcely avail him. There were married women and children, among others, interested in a nearer or more remote degree ; and many of them. They could suggest and advise, and the executor could adopt or reject, as he saw fit. The responsibility was upon him. It would have been a clear violation of duty for him to follow crude suggestions leading to disaster. Still, in a proper case, he might avail himself of an estoppel; but, as has already been remarked, I see no facts upon which he can base one in this case. It results from these views that the executor can not escape liability for the two thousand dollars. It should be restored to the fund, and Mrs. Baylies has a right to such interest thereon as has not already been received by her from Mr. Barker. It appears that his last payment of interest was in January, 1872.
The credit claimed by the executor for two thousand five hundred dollars, paid to the administrator of Mr. Barker, for legal services rendered by the latter, must be disallowed. By the evidence it is shown that Mr. Barker from time to time, as extraordinary services were rendered, received pay therefor. In simply receiving and paying over the interest and other moneys, he retained commissions which belonged to the executors. As nearly as I can ascertain the amount so received, it was about two thousand three hundred dollars, besides *469 what he retained from the interest on the United States bonds, while he paid over to them only some seven hundred and fifty dollars. It would seem, therefore, that he thus paid himself at least one thousand five hundred dollars. If he had any legal claim against the executors, it is a little remarkable that no charges of the kind were found upon his books. The fair inference is, that in some way he was fully paid.
The other item of credit for two hundred and fifty dollars paid for clerical services in making up the account, must also be disallowed. Mr. Barker was agent for the executors. Had he been alive to render his account to his employers, he could have made no legal charge for such a service. It would have been a simple duty he owed them, to render an account of his stewardship; and the fact that his accounts were kept so loosely and carelessly as to have made the labor a very serious one, was a matter of which he could not reasonably complain. In this respect his administrator stands precisely in his place, and as his legal representative it was his duty, without charge, to furnish such account.
As to the counsel of the executor in this proceeding, however, the matter is different. It was formerly held that an executor could not be allowed any charges for making up his account, but by the act of 1863 it is declared that on every accounting the surrogate shall :allow to the executor, for services of counsel in preparing for and attending upon the accounting, not to exceed ten dollars per day. I think that the making up of the account is fairly embraced in this provision. In many, perhaps most, cases, the only preparation is in making out the account. The executor will be allowed for such services when the proper evidence shall be presented.
I think this court has no right to take cognizance of the separate fund in which Mrs. Rea is interested as *470 cestui que trust. The trust relates solely to real estate. At common law, on the death of the trustee, it would have devolved on the heir (Attorney-General v. Lady Downing, Wilmot’s Opinions, 21; Berrien v. McLane, Hoffm., 421). In Hall v. May (3 Kay & 585), it was held that “where the deed of settlement devolves upon the trustee, Ms heirs or assigns, it has finally been considered that this implies that the trustee may devise the estate to any one he may deem more M to execute the trust than the heir, and that such devisee may not only hold the legal estate, but also-execute the trust.” This was so held where the common-law rule prevailed. By our statute of uses and trusts, however, it is provided that “upon the death of the surviving trustee of an express trust, the trust estate shall not descend to' his heirs, nor pass to his personal representatives; but the trust, if then unexecuted, shall vest in the supreme court, with all the powers and duties of the original trustee, and shall be executed by some person appointed for that purpose, under the direction of the court ” (3 B. B. 22, § 87, 5th ed.). The common-law doctrine has thus been abrogated (Hawley v. Ross, 7 Paige, 103 ; Glen v. Gibson, 9 Barb., 634; Bunn v. Vaughan, 1 Abb. Ct. App. Dec., 253 ; Milbank v. Crane, 25 How. Pr., 193). The-trust was unexecuted when the testator died, and at Ms death vested at once in the supreme court. That court, in the discharge of its duty, appointed Mr. Brown to execute the trust, and it has sole and exclusive jurisdiction over him, his conduct and accounts.
In view of the alleged difficulty of adjusting the accounts properly, because of the intermingling of the two funds, it is suggested that it is doubtless competent for Mrs. Rea in so far as her separate trust is concerned, to acquiesce in the result of this accounting, if she shall be so advised.
A decree must be entered in accordance with the. views above expressed. December 21, 1874.-